NORTON, Executor, Appellant, *v.* GREAT NORTHERN RAILWAY CO. et al., Respondents.

(No. 6,290.)

(Submitted April 11, 1929. Decided June 19, 1929.)

[278 Pac. 521.]

*Mr. Wm. Scallon* and *Mr. Jos. R. Wine,* for Appellant, submitted a brief; *Mr. Wine* argued the cause orally.

*Mr. W. L. Clift, Mr. R. H. Glover* and *Mr. T. B. Weir,* for Respondents, submitted a brief; *Mr. Clift* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Henry Burns Norton died December 16, 1924, as a result of injuries received when the defendant company's passenger train No. 238, on which Rombough was engineer and Joranger fireman, collided with a street-car, operated by the Helena Light & Railway Company between Helena and East Helena, on which Norton was a passenger.

This action was commenced originally against the present defendants and the Helena Light & Railway Company and one Miller, conductor of the street-car; the motorman was killed at the time of the collision. In due time issue was joined as to all defendants and a trial had to the court and a jury, which trial resulted in a dismissal as to Miller and a verdict in favor of all other defendants, and a judgment thereon was duly entered. Plaintiff was, however, granted a new trial, and thereafter the plaintiff dismissed as to the Helena Light & Railway Company; from the order granting a new trial these defendants appealed, and on appeal the order was affirmed. (*Norton* v. *Great Northern Ry. Co.*, 78 Mont. 273, 254 Pac. 165.) In due time the cause was again brought on for trial, and thereon the court directed the jury to return a verdict in favor of defendant Joranger; the case being submitted to the jury on the evidence adduced, and, under the instructions of the court, the jury returned a verdict in favor of the remaining defendants, and thereon judgment was duly entered. Plaintiff has appealed from the judgment; he makes ten specifications of error, nine of which challenge the correctness of certain instructions given and the action of the court in refusing to give certain offered instructions; the tenth is that the court erred in denying plaintiff a new trial.

A sufficient synopsis of the pleadings is to be found in the opinion in *Norton* v. *Great Northern Ry. Co.*, above. From the record the following facts appear with reasonable certainty:

East Helena lies approximately five miles east of Helena; they are connected by two railroads and, at the time of the collision, were connected by an interurban railway line. Helena is situated in mountainous country, but the territory east thereof to and beyond East Helena is rolling prairie. Approaching Helena across this prairie the Great Northern track runs in a straight line at an angle of eleven degrees and thirty minutes north of west. A quarter of a mile east of the corporate limits of Helena a public highway crossed the railway track at grade, and, paralleling the traveled portion thereof, the street-car track also crossed the railway track at grade and within the railway fences erected sixty feet apart as the east and west boundaries of the highway. For at least 1,000 feet west of this crossing the street-car track paralleled the railway track, but fifty-five feet distant. The railway company's whistling-post for the crossing is approximately a quarter of a mile east thereof; from this post to the crossing and on over the 1,000 feet west there is nothing to obstruct the view from either an engine or a street-car approaching the crossing. Both the engineer and the fireman of train No. 238 are old employees of their company and have long been familiar with the crossing and with the fact that, prior to the day of the collision, a street-car negotiated it every half hour.

On December 16, 1924, the thermometer registered approximately thirty degrees below zero, with a wind from a generally westerly direction blowing at about ten miles an hour at the crossing. While there was frost and snow in the air there was a reasonably clear visibility so that objects could be readily seen at a distance of at least a quarter of a mile.

It was the duty of the railway company to cause each locomotive whistle to signal for the crossing on passing the whistling-post and to keep its bell ringing from that point until the crossing was reached, and to cause a lookout to be kept ahead during all of that period. As the company could only act through its employees, these duties devolved upon the men in charge of the engine hauling the train. The locomotive whistle is under the control of the engineer and, as the engine

drawing train No. 238 was equipped with an automatic bell ringer with the switch thereof placed on the right-hand of the engineer's side of the cab, it was his duty to switch this device on at or near the whistling-post and to keep the bell ringing until the crossing was passed. Motormen in charge of street-cars were required to bring their cars to a stop to the south of the railway track and to "look and listen" for approaching trains before going upon the crossing.

On December 16, 1924, train No. 238 was about thirty minutes late; this brought it to the crossing at 11:22 or 11:23 A. M. Approaching the crossing, just prior to the time the train reached the crossing, the motorman in charge of the street-car in question scraped the frost from the front window from time to time with a piece of metal, thus affording him a view ahead, while all other windows of the car were frosted so that passengers could not see out. Arriving at the usual stopping place, the motorman brought his car to a stop, lowered the front window, immediately closed it and called to the conductor, "Let's go," and set his car in motion; it was stationary but from four to eight seconds.

The train approached the crossing traveling at approximately thirty miles an hour. As the engineer observed the front end of the street-car on the crossing he sounded two sharp blasts of the whistle and set the emergency brakes; a collision followed almost immediately. The street-car was demolished and the engine derailed, but the train traveled a distance of 609 feet before coming to a stop, due largely to the breaking of air lines which diminished the braking facility of the engine. Several passengers on the street-car were killed and others injured; Henry Burns Norton was either instantly killed, as claimed by the defendants, or received injuries from which he died within a very short time, as alleged by the plaintiff.

Plaintiff charges that the collision was due to the negligence of the defendants in failing to sound the crossing signal at all or keep the bell ringing until the crossing was reached; and failing to sound the whistle and ring the bell "at a time or place, or in a manner sufficient in view of all the conditions

attendant at said crossing, inclusive of weather conditions, to give timely, or any, warning, of the approach of said train No. 238 to persons who were using, or about to use, said crossing"; failing to run the train at a reasonable rate of speed or to have the engine under proper control; and in failing to keep a lookout as the train approached the crossing.

1. The first specification of error is that the court erred in giving its instruction No. 16, which reads: "You are instructed to return a verdict for the defendant Christopher Joranger." Counsel for plaintiff assert that there was a conflict in the evidence respecting the question as to whether or not this defendant was guilty of negligence as charged, and that his credibility as a witness was rendered questionable by contradictory statements shown, which, in effect, amounted to impeachment of the witness.

The plaintiff alleged that Joranger was negligent in failing to perform his duty in (a) ringing the locomotive bell, and (b) keeping a lookout ahead while the train approached the crossing. The defendants denied that any such duties were imposed upon the fireman. As to (a), the evidence is that, ordinarily, the fireman does not, as of old, ring the bell, but by the testimony of Joranger himself it was shown that in extremely cold weather the bell is likely to freeze in position, when the automatic ringer will not start it in motion; at such times it is the duty of the fireman to start the bell ringing by the use of the hand rope which is placed directly over his head when on his seat on the left-hand side of the engine. As to (b), Joranger himself testified that approaching crossings he is "supposed to get on the seat box," and, further, that "it is the fireman's duty when sitting on his seat to look out for cars, automobiles, vehicles, when approaching a crossing and to warn the engineer." With the allegations of the duty of the fireman thus established, we must consider the evidence relative to a breach of such duties and whether, if there is evidence of a breach of duty constituting negligence on the part of the fireman, such negligence was a proximate cause of the collision, in order to solve the question as to whether

the court committed reversible error in withdrawing the case from the jury, in so far as Joranger is concerned.

(a) With reference to the ringing of the bell the engineer testified that he started the bell ringing by turning the switch setting the automatic device in motion and knew that the bell was ringing because he saw it ringing. Joranger testified that "the engineer started the bell ringing before the wreck took place; I am certain about that. * * * I don't remember seeing him start it ringing, but I know he started it." Joranger had theretofore been examined on this subject at the coroner's inquest, the day after the collision, and again, by deposition, in November, 1925. At the coroner's inquest Joranger testified that he started the bell ringing; his attention was called to his previous testimony, and he was asked which statement was true; after some evasion, his answer was, "You can start the bell ringing by pulling the rope." After considerable wrangling between counsel and the witness, Joranger was again asked whether he started the bell ringing, to which he answered, "I don't remember." Later he stated that he did not start the bell ringing and was then asked concerning his statement at the coroner's inquest and replied, "I mean I did pull the rope," but again, later, testified, "I don't remember as I started the bell ringing with the rope." Asked if he told the truth at the inquest, he replied, "Well, I was telling the truth, probably." After further cross-examination, going back over the same ground, the witness again stated positively that the engineer started the bell ringing and that he did not; he then stated that he did not want to change his testimony given at the coroner's inquest, and was then asked if he wanted to stand on his answer there that he started the bell ringing, when his answer was, "With the bell rope."

In his testimony before the coroner, Joranger stated that he could not say whether the bell was ringing or not, and in the deposition mentioned he was asked, "Can you say on your oath whether that bell was ringing at all before the collision took place?" To which he answered, "No, I can't do that."

These statements being called to his attention on the stand, he attempted to explain them by saying that he did not understand the question asked and that he was referring to a time after the collision, and again that he referred to not hearing the bell ringing rather than not knowing that it was ringing.

The question as to whether or not the bell was ringing as the train approached the crossing was important. The law requires the bell to be rung from "a point between fifty and eighty rods from" any "highway, road or railroad crossing" until the crossing is reached (sec. 6521, Rev. Codes 1921), as a warning to anyone attempting to use the crossing, and it is clear that there was a highway or road crossing in juxtaposition with the street railway crossing. The weather was such as was likely to prevent the operation of the automatic bell ringer, and, although the engineer may have performed his duty in setting that mechanism in position to ring the bell, the bell may, nevertheless, have failed to ring without the performance of the fireman's duty outlined above.

In view of the contradictory statements made by the witness Joranger, his credibility was peculiarly a matter for decision by the jury, if, in fact, the failure to give warning of the approach of the train was shown to constitute a proximate cause of the collision. The statements of this witness, in this regard, made at the inquest immediately after the accident and when the matters were fresh in the minds of the witnesses, if believed by the jury, contradict the testimony of the engineer on the same subject, and this conflict, considered with other evidence and circumstances, might have been sufficient to warrant a jury in discarding the testimony of both personal defendants. The surviving passengers of the street-car, persons who were passengers and railway employees riding on the train at the time, did not hear the bell, and the question as to whether or not this signal was given was to be determined from the testimony of the fireman and the engineer.

(b) The duty imposed upon the engineer and the fireman to keep a lookout on approaching the crossing was brought home to these two defendants. Joranger testified that, on hear-

ing the crossing signal as the engine passed the whistling-post, he got to his seat on the left side of the cab and attempted to look ahead through a window equipped with double glass, with an air space between which kept it free from frost, but could not see out by reason of the fact that the wind, blowing from a point north of northwest, carried the smoke and steam from the engine to his side of the cab and obscured vision through the window; he then opened the side window and attempted to look ahead but could see nothing from that position, and then again endeavored to obtain a view of the track ahead through the front window without success because of the continued smoke screen across his window. He testified: "I told the engineer that I couldn't see anything from my side and he said he could see"; he then stepped down from the seat to look at the steam gauge; he estimated that he was on the seat from fifteen to twenty seconds. Joranger testified that it was his duty to watch the steam gauge, but it was shown that, at the coroner's inquest, when asked why he got off his seat to look at the gauge, he answered, "I don't know. Curiosity, I suppose, or something." He, in effect, explained his former testimony as inaptness of expression.

Joranger's testimony regarding the directions of the wind and the smoke condition is corroborated to some extent by the testimony of passengers on the train, to the effect that at the time in question smoke was rolling along the left side of the train from the smoking car to the observation car, and the engineer's statement that during the whole trip from Butte he had observed that the "heavy storm" caused the smoke to roll directly down the stack, to the one side or the other, as the wind or the train changed direction.

Counsel for plaintiff contend that sharp conflict with this evidence as a whole, and Joranger's testimony in particular, was produced by the testimony of one Powell, to the effect that he descended from the left side of the train immediately after the accident and the wind was blowing directly against that side of the train, consequently, from the south or southwest, and the records of automatic wind registers

—one of which was located at the government weather bureau on top of the Power Block in Helena two and a half miles west or southwest of the crossing, the other at the East Helena smelter two and a half miles east of the crossing—it being asserted that, on showing the direction of the wind at the two points five miles apart with open country between, the conclusion must necessarily follow that the direction of the wind at the crossing was the same as at these two points. The fallacy of this assertion, however, is demonstrated by the fact that the records made by identical instruments at the two points mentioned do not correspond. The collision occurred at 11:22 or 11:23 A. M. The record made at East Helena shows a continuous west wind from 10 A. M. until noon, while that made at Helena shows a west wind from 10:46 to 11 A. M.; northwest at 11:01; northwest at 11:08; west then for three minutes; northwest at 11:13; then west up to 11:23; southwest at 11:24; then west for two minutes; then southwest for two minutes.

Checking the two records, we find that both show a west wind during the time the train was traveling from the whistling-post to the crossing, but, while the wind remained the same at East Helena thereafter, within one or two minutes after the collision, the wind blowing over the top of the Power Block changed to southwest. If the wind at the crossing was blowing in the same direction as it was at the Power Block, Powell was right in saying that the wind was in his face when he got off the train, but his statement would not prove that the wind was from that direction at the time covered by Joranger's testimony and that of the passengers on the train, and if the wind was from the direction at the crossing that it was blowing at East Helena, during all of the time covered, Powell's statement would be disproved by plaintiff's own testimony.

The conflict raised by this record evidence, if any, is negligible, for the further reason that William E. Maughan, of the weather bureau, testified that the recording instrument used by the government, which was identical with that used by the

smelter company, would continue to register a west wind until the wind moved beyond twenty-two and a half degrees north of west; so that, while both instruments registered a west wind during the time mentioned by Joranger, at both points the wind might have been blowing from twenty-two and a half degrees north of west. Maughan further testified that Helena is in the mountains, "abounds in hills, some of them quite steep," while the crossing is on comparatively level country; that "all this has a distinct bearing on the situation outside; * * * rough country like this causes different wind currents, so that it would not necessarily be the same on top of the Power Block and the crossing in question." He further testified, "I wouldn't say that the wind was not blowing from the northwest at the crossing."

The record does not disclose that the topography of the country surrounding the location of the smelter instrument differed from that around the crossing, so that Maughan's testimony would not necessarily apply to the record there made, except that, although the instrument registered a west wind, the wind might be blowing from a point twenty-two and a half degrees north of west.

However, the record discloses evidence of a more material nature tending to dispute the testimony of Joranger and thus raise a substantial conflict in the testimony regarding the important question as to whether or not Joranger could have kept a lookout from his window.

As pointed out above, engineer Rombough testified as to the peculiar atmospheric condition causing the smoke to roll directly down from the stack, and that this smoke would descend on the one side or the other of the cab as the directions of the wind or course of travel changed. He testified that, approaching the crossing, he was looking ahead, and that his eyesight was good. He did not corroborate Joranger's statement concerning the alleged conversation in which Joranger says he told Rombough that he could not see from his side of the engine and Rombough told him that he could see, and, on the trial, Rombough did not attempt to explain his failure to see the

street-car either at rest to the south of the railway track or in motion toward it. However, on rebuttal, the court reporter was permitted, without objection, to read into the record a portion of Rombough's testimony before the coroner's jury, at which time he testified that it was impossible for *him* "to see anything ahead" because the smoke was rolling down *his* side of the cab. He explained the action of smoke during certain phases of the weather and stated, "No one excepting an engineer or fireman can tell how the smoke rolls down over the cab in bad weather." The engineer made it plain that the smoke would roll down on the one side of the cab or the other; it did not roll down on both sides at the same time, at least there is no showing that such a condition was possible; his explanation as to why he did not see ahead, made at the coroner's inquest, was in the record to be considered by the jury; it contradicts Joranger's statement that the smoke was rolling down on *his* side of the cab, and that the wind was from the northwest, "more north than northwest." Both could not have been right, and it was a question for the jury as to which was right, if, in fact, the failure to see the car at any time before the collision was a proximate cause of the collision.

Had the engineer and fireman done all that a reasonably prudent man would have done under the circumstances and the collision nevertheless occurred, through the sole negligence of the street-car company and its employees, if error was committed in directing a verdict as to Joranger, it would have been harmless error. Had these men, or either of them, seen the street-car at rest in its customary place awaiting the passage of an on-coming train, they would have been justified in proceeding on the assumption that the motorman was aware of the approaching train and would not attempt to negotiate the crossing until the train had passed, and they would have been required to have done nothing further than to keep the bell ringing until the crossing was reached; but what of their duty had they been keeping a proper lookout and had seen the street-car remain at a standstill for but four to eight seconds

and then move forward toward the crossing in imminent peril of collision?

After the collision tests were made to show the time consumed in various actions of the street-car men. The street-car in question was estimated to have stopped from eight, ten or twelve feet south of the railway track; the usual stopping place was eighteen feet south. It was shown that from the usual stopping place a street-car consumed eight seconds, approximately, in getting to the position in which the car in question was struck, and that, given three additional seconds, it would clear the railway track. The train was approaching at the rate of approximately thirty miles an hour, or a little less, according to the testimony of the engineer, so that it was traveling not to exceed forty-four feet per second and would have been considerably more than 300 feet distant at the time the street-car started ahead. We are not advised in the record as to the distance such a train as No. 238 would have run after the application of the emergency brakes; it is shown that this train came to a stop in 609 feet, having gone "a great deal further than it would have gone had it not been for the breakage." But it is possible that, had a proper lookout been maintained, with "clear visibility" for the distance to be traveled, the car would have been seen to start ahead and thereupon the application of the emergency brakes would have either stopped the train before it reached the crossing or so slowed up that the street-car would have been given the additional three seconds necessary to clear the track, or it may be possible that, under such circumstances, additional signals might have been given which, at that short distance, would have been heard by the motorman in time to have stopped the car before getting upon the track.

We are mindful of the rule with respect to one faced with a sudden emergency, which would be applicable, had the trainmen seen the car moving forward a few seconds before the train reached the crossing (*Burns* v. *Eminger*, 84 Mont. 397, 276 Pac. 437), and we do not wish to be understood as presuming to say what a reasonably prudent man might or might

not do in an infinitesimal fraction of time, but we fail to find in the record any justification for the differentiation between the engineer and fireman; if, as the court held, a case was made for the jury as to Rombough, one was also made as to Joranger. Under the evidence adduced, one or the other could see ahead while the other could not, and it was for the jury to weigh the evidence, determine the credibility of the witnesses and say, as between the two, which was right and which was wrong. The court in effect absolved Joranger of negligence and told the jury that the engineer alone was chargeable with maintaining a lookout.

If the collision occurred by reason of the failure to maintain a proper lookout, such negligence was a proximate cause of the collision under instructions given, and the matter should have been submitted to the jury for their determination under proper instructions applicable to the facts. A court is not authorized to determine disputed facts and may only direct a verdict where, from the undisputed facts, the conclusion necessarily follows, as a matter of law, that a recovery cannot be had on any view which may reasonably be taken from the facts established. (*Durocher* v. *Myers*, 84 Mont. 225, 274 Pac. 1062.)

After an exhaustive study of the record we reach the conclusion that the court erred in directing a verdict as to Joranger, and that such error affected the substantial rights of the plaintiff, since, while it may have been wholly immaterial to the plaintiff whether or not he recovered judgment against this co-defendant, the direction of the court had the effect of withdrawing from the jury's consideration the proof tending to establish the negligence of the principal defendant, a corporation which could only be held by reason of the negligence, if any, of its employees, and may well have misled the jury into believing that the failure of either the engineer or fireman to maintain a lookout would not constitute actionable negligence of the railway company.

2. Specifications 2, 3 and 4 predicate error upon the court's refusal to give offered instructions to the effect that the

giving of the crossing signals, as required by statute, does not necessarily constitute full performance of duty, but that, if at a given time, conditions and circumstances exist by reason of which an ordinarily prudent man operating an engine would know that such signals had not been heard or that his train had not been seen by persons using the crossing, the engineer should give such additional signals as an ordinarily prudent man would deem necessary, and that, if the jury believed from the evidence that conditions existed at the crossing in question bringing the case within the rule announced, and that the engineer should have known that such condition existed, his failure to give additional signals would constitute negligence, and, if they further found that such negligence was the proximate cause of the collision, they might find for the plaintiff.

Granting the correctness of the legal principle woven into the instructions (Thompson on Negligence, sec. 1555), we have searched the record in vain for evidence of any condition or circumstance existing at the crossing just prior to the collision bringing this case within the rule. True, it was shown that it was a very cold day, with frost and snow in the air and with a ten-mile wind blowing from the direction of the street-car toward the approaching train, but the evidence is that there was a clear visibility for at least a quarter of a mile over a straight and level track with no obstructions intervening, and that the wind, at most, would but delay the transmission of sound a second or two. Passengers on the street-car testified on behalf of the plaintiff that they did not hear the crossing signals, but this testimony was adduced on the theory, not that they could not be heard on account of atmospheric or other conditions existing, but that they were in fact not given. Further it was shown that the windows on the street-car were frosted over so that passengers could not see out, but the passengers, and particularly the deceased, were under no duty to keep a lookout, and no negligence is charged or imputable to deceased, and this condition did not pertain with reference to the motorman, as it was shown that he scraped the frost

from his lookout window, from time to time, and thus had a view ahead.

Instructions should always be based upon, and responsive to, the evidence, and no error is committed in refusing to give an instruction correctly stating the law, but not warranted by the evidence. (*Mosback* v. *Smith Bros. Sheep Co.*, 65 Mont. 42, 210 Pac. 910; *Rogness* v. *Northern Pac. R. Co.*, 59 Mont. 373, 196 Pac. 989; *Howard* v. *Flathead Independent Tel. Co.*, 49 Mont. 197, 141 Pac. 153.) No error was committed in refusing the offered instructions.

3. Specifications 5 and 6 predicate error upon the giving of two instructions dealing with the question of negligence on the part of the street railway company and its employees. Counsel for plaintiff contend that such negligence was not an issue in the case and its submission was misleading to the jury. In this counsel are mistaken. The burden rested upon the plaintiff to show that the, or a, proximate cause of injury was the negligence of the railway company and its employees; he so charged in his complaint. The defendants alleged, and defended upon the ground, that the employees of the street-car company were guilty of negligence and that such negligence was the *sole* cause of the collision. Early in the court's instructions, either at the request of plaintiff, as stated by counsel for the defendants, or at least without objection, the court instructed the jury that "there is no contention or claim in this case that the deceased * * * was guilty of any negligence, but the defendants here do contend that the Helena Light and Railway Company and its employees * * * were guilty of negligence and that such negligence was the sole cause of the collision. In this connection * * * if you find from a preponderance of the evidence that the defendants * * * were guilty of negligence * * * as defined in these instructions, and that such negligence was a proximate cause of the injuries * * * your verdict should be in favor of the plaintiff even though you may find that there was negligence on the part of the Helena Light and Railway Company and its employees." The questioned instructions but

defined the duties of the employees of the street railway company on approaching the crossing and advised the jury that, if they found that these parties were negligent in this regard and that such negligence was the *sole* proximate cause of the collision, their verdict should be for the defendants, thus complementing and completing the instructions theretofore given on plaintiff's theory as to this phase of the case.

As the burden rested upon the plaintiff to show that the negligence alleged was a proximate cause of the injury, the defendants were entitled to defend by showing, if they could, that the injury was caused solely by the negligence of third persons for whom they were not responsible, and were entitled to have the jury instructed with regard to that defense. (45 C. J. 1141; Pomeroy's Code Remedies, 4th ed., sec. 55; *Sais* v. *City Electric Co.*, 26 N. M. 66, 188 Pac. 1110; *Multnomah County* v. *Willamette Towing Co.*, 49 Or. 204, 89 Pac. 389; *Bragg* v. *Metropolitan Street Ry. Co.*, 192 Mo. 331, 91 S. W. 527.)

4. Over the objection that the instruction was erroneous in ▮ that, under the statute, it was the duty of the engineer to blow the whistle and ring the bell on approaching this intersection, the court advised the jury that: "It is made the duty of railroad corporations by statute in this state, to have the whistles * * * sounded and the bells * * * rung in approaching highway, road or railroad crossing. The streetcar crossing where the collision * * * occurred, however, does not come within the provisions of said statute, unless you find that the street car line at said crossing was constructed and maintained on or within the limits of a public highway; however, this does not mean that it should have been constructed upon the traveled portion of the highway."

The theory upon which this instruction was offered, and given, is that, under the usual rules of statutory construction, a statute dealing exclusively with "railroads" has no application to street railways (*Helena Light & Ry. Co.* v. *City of Helena*, 47 Mont. 18, 130 Pac. 446; *Daly Bank & Trust Co.* v. *Great Falls Street R. Co.*, 32 Mont. 298, 80 Pac. 252), and

therefore the provision in section 6521, Revised Codes of 1921, requiring signals on approaching "any highway, road or railroad crossing" does not include street railway crossings in the term "railroad crossing," and, by parity of reasoning, does not include such a crossing in the terms "highway" or "road" crossing. Plaintiff contends that a street-car line is a "public highway," and therefore the statutory requirement as to signals is applicable.

We need not here determine the status of a street railway, and the instruction might well have been omitted, as the record seems to be barren of any testimony to the effect that the track was laid outside the exterior boundaries of the highway which had existed in its present position and condition, with the street railway thereon, for more than twenty years. The testimony on the subject goes no further than that the street-car track was not built upon any part of the traveled portion of the highway, but was built within the sixty-foot strip bounded on each side by a railway fence. It is clear from the record that the highway crossing the railway track was a public highway sixty feet in width, regardless of the width of the traveled portion thereof. (Secs. 1612 and 1615, Rev. Codes 1921.) The instruction given was not, therefore, applicable to facts in the case and was erroneous.

5. Specification No. 8 predicates error upon the following instruction given: "The law does not impose liability on a defendant merely because some one is injured or killed and such defendant was present, and some act or omission of the defendant, if such is the case, contributed to cause such injury or death. Before such defendant can be held liable, it must appear that such act or omission was negligent. The mere fact, therefore, that the engine and the street car came into collision is not enough to establish liability on the part of the Great Northern Railway Company or its employees. Before you can return a verdict against said railway company, or its employees, in addition to the fact of the collision, the plaintiff must establish by evidence that there was some negligence on the part of the railway company or its employees for

which the plaintiff seeks to hold said defendants. If the plaintiff has not established such negligence you will return a verdict for the Great Northern Railway Company and its employees."

Counsel for plaintiff complain of this instruction because, they say, it does not state how, wherein, or by what criterion the negligence mentioned is to be measured and determined by the jury. . As has been often said by this court, one instruction cannot cover the whole case, and the instructions are to be taken and read together, the whole as one instruction. Clearly the negligence referred to in this instruction is that charged in the complaint and abundantly covered and defined in the lengthy instructions given.

6. Specification 9 challenges the correctness of that portion of instruction No. 27 which declares that, "while negligence may be proved by indirect or circumstantial evidence, the circumstances, if any thus proved, must not only tend to prove negligence, and that such negligence was a proximate cause of the injury, but they must equally tend to exclude any other reasonable conclusions." This instruction correctly states the law as to proof by circumstantial evidence in civil cases. In such cases the rigorous rules applicable to criminal cases do not apply (*Gilmore* v. *Ostronich,* 48 Mont. 305, 137 Pac. 378), but the burden of proof is not satisfied if the conclusion reached from testimony offered by the party upon whom it rests is equally consonant with the truth of his allegations and with some other theory inconsistent therewith, as in such event the result is mere conjecture, insufficient to warrant a verdict in his favor. Proof of a fact by circumstantial evidence, in a civil action, must, therefore, "tend to exclude all other inferences" than that which the party offering such evidence would have the jury draw therefrom. (*Park* v. *Grady,* 62 Mont. 246, 204 Pac. 382.)

Plaintiff's counsel rely upon the statement made in *Gilmore* v. *Ostronich,* above, to the effect that, when circumstantial evidence furnishes support for the plaintiff's theory of the case "and thus tends to exclude any other theory," it is sufficient

to sustain a verdict or decision. This statement does not modify nor recede from the general rule as to circumstantial evidence in such cases which is declared in the syllabus by the court in the following language: "Where, in a civil action, circumstantial evidence solely is relied on by plaintiff to prove an issue of fact, it is sufficient to sustain the verdict or decision if it produces moral certainty in an unprejudiced mind as to the truth of his theory to the exclusion of any theory opposed thereto"; it but declares a rule in aid of the courts in determining the sufficiency of verdicts or decisions based upon such evidence; it could not have been substituted for the instruction given. Had plaintiff desired an instruction based upon this statement to the effect that circumstantial evidence sufficient to support plaintiff's theory of the case tends to exclude any other theory, his counsel should have prepared and presented such an instruction and requested that it be given in addition to the instruction questioned. That such an instruction should have been given in the case at bar, had it been offered, is very doubtful, as the circumstantial evidence introduced tended to show, not only that those in charge of the engine were negligent, but that those in charge of the street-car were also negligent.

Under the instructions given, if the jury believed that the negligence of the trainmen was a proximate cause of the collision, a verdict might have been returned against the defendants in spite of the negligence of the street-car men, but if they decided that the negligence of the latter was the sole proximate cause of the collision, and that the trainmen were not negligent in the manner charged, they could but return the verdict which they returned.

It is to be regretted that, after the parties to this action have gone through two lengthy and costly trials, the judgment must be reversed for such an error as the direction of a verdict in favor of a defendant to whom the plaintiff would hardly have looked for satisfaction of any judgment recovered, but, as pointed out above, such dismissal may have led directly to the favorable verdict rendered for the railway company, and,

with this error in law committed on the trial, the court again erred in denying plaintiff's motion for a new trial.

The judgment is reversed and the cause remanded to the district court of Lewis and Clark county for a new trial.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.